Cecil DOUGLAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–86–048–CR.

Court of Appeals of Texas, Waco.

June 18, 1987.

Paul E. Gartner, Jr., Waco, for appellant.

Vic Feazell, Crim. Dist. Atty., R.D. Rucker, Asst. Dist. Atty., Waco, for appellee.

## OPINION

THOMAS, Justice.

A jury convicted Appellant of robbery and assessed his punishment at thirty-four years in prison. He contends the court should have dismissed the indictment because of a violation of the Speedy Trial Act, suppressed the victim's in-court identification testimony, and suppressed evidence seized by police during a "pat-down" search and while he was being "booked" into jail. He also claims the instruction on the parole law violated his constitutional rights and constituted fundamental error. The conviction will be affirmed.

A black male entered a Zippy convenience store at 2:00 a.m. on May 29, 1985, and told Gaby Bowers, the clerk, that he wanted to purchase a package of Salem cigarettes. When Bowers laid a pack of Salems on the counter, the man put a hand into the pocket of his blue sweat pants and said, "Give me all your money or I'll shoot." He held his hand inside the pocket as if he had a weapon. Bowers gave him $53 in currency from the cash register, all in $1 and $5 bills, and the man walked out of the store, taking the package of Salems with him.

Bowers immediately called police and gave them a description of the robber. She described him as a young black male, approximately five feet-nine inches tall, weighing 140 pounds, and wearing a nylon stocking cap and dark blue sweat pants with a white string around the waist. Police officers stopped an automobile a few minutes after the robbery and arrested Appellant who was a passenger in the car. He was not wearing a shirt or a stocking cap, but was wearing red tennis shoes and blue sweat pants with a white string around the waist. Officers conducted a "pat-down" search of Appellant and seized an unopened package of Salem cigarettes from his sock. Police officers later recovered $48 in currency, all in $5 and $1 bills, from his shoe and sock while he was being booked into jail. The excise tax number on the pack of Salems taken from Appellant matched the tax number on packages of Salems in the cigarette display rack behind the counter at the Zippy store.

Officers drove Appellant to the Zippy store within twenty minutes after the robbery and asked Bowers if she could identify him as her assailant. Bowers, who said the robbery had made her nervous, upset and scared, did not make a positive identification of him at that time, but did tell officers that she "thought" he was the robber. However, she positively identified Appellant at the suppression hearing and the trial as the person who robbed her. Appellant denied that he had committed the robbery.

■ Appellant's first point of error involves the Speedy Trial Act, which requires the state to be ready for trial on a felony within 120 days after the criminal action commences. *See* Tex.Code Crim.Proc.Ann. art. 32A.02, § 1(1) (Vernon Supp.1987). A criminal action commences, except as otherwise provided in the Act, when the accused is indicted or arrested, whichever occurs first. *Id.* at § 2(a). The state does not have to announce its readiness within the applicable time limit, but may make a *prima facie* showing of its readiness by declaring at the hearing on the motion to dismiss that it is then ready and has been ready at the times required by the Act. *Jordan v. State*, 639 S.W.2d 477, 478 (Tex. Cr.App.1982). A *prima facie* showing of readiness shifts the burden to the accused to prove otherwise. *Phillips v. State*, 659 S.W.2d 415, 419 (Tex.Cr.App.1983).

■ One of the ways the accused can rebut a *prima facie* showing of readiness is by proving that he was absent during the

applicable time limit. *Newton v. State*, 641 S.W.2d 530, 531 (Tex.Cr.App.1982). This is because the state, although ready from an evidentiary standpoint, cannot be ready for trial within the meaning of the Act while the accused is absent. *Id.* Producing the accused for trial is a part of the state's burden of readiness. *Id.* Therefore, once the accused establishes that he was absent during the applicable time limit, the burden shifts back to the state to exclude the period of his absence under section 4 of the Act. *Id;* Tex.Code Crim.Proc.Ann. art. 32A.02, § 4 (Vernon Supp.1987). These rules will determine the disposition of the first point of error.

The criminal action commenced against Appellant on May 29, 1985, the date of his arrest. *See* Tex.Code Crim.Proc.Ann. art. 32A.02, § 2(a) (Vernon Supp.1987). Therefore, the State had to be ready for trial on the felony by September 26, the 120th day after his arrest. *See id.* at § 1(1). He was indicted for the offense on September 17, which was 9 days prior to the expiration of the 120–day period. The court heard Appellant's motion to dismiss the indictment on February 24, 1986, at which time the prosecutor gave the following testimony under cross-examination:

Q And do you recall the date of the indictment in this cause?

A The 17th day of September 1985.

Q Were you ready for trial at that time?

A I was.

Q What if any—do you know where [Appellant] was at the time of the indictment, where he was physically located?

A I do not know where [Appellant] was physically located at the time of the indictment. I do know that on the 15th day of July 1985 I talked to Mr. Rollin Khoury, a licensed attorney in McLennan County, and reviewed the file with him, and indicated what the State expected and anticipated to produce by way of testimony in this cause, and further made an offer of a certain number of years of time to do rather than proceed to trial in this particular cause.

Q Okay. What if any steps did you take to bench warrant [Appellant] back from T.D.C.?

A Well, if Mr.—if [Appellant] was bench warranted back from T.D.C., I am sure that I am the one who made arrangements for the bench warrant to bring him back.

Q I'll hand the Court file that has been introduced into evidence and ask you if you can identify a document in the Court's file, which is now in evidence in this hearing, entitled an application for bench warrant?

A That is what it is. And the file stamp on this is apparently October the 7th, at 10:36 a.m. 1985.

Q Did you or anybody else in your office to your knowledge make any attempts to bench [Appellant] back prior to the date of October—

A 7th.

Q —7th, 1985?

A When I was talking with Mr. Khoury [on July 15], [Appellant] was in the McLennan County jail, and—I'm trying to refresh my memory and recollection in this particular cause.

There was another attorney involved in this set of sequences in which we were going to set up a polygraph examination for [Appellant]. And I don't remember whether he's the person who told me that [Appellant] was at T.D.C., or whether on the date normally scheduled for arraignment, *which would have been sometime prior to the 29th day of September 1985*, it appeared on the Court's docket that the defendant was in Texas Department of Corrections and we made arrangements after that scheduled arraignment to bench him back.

Q So you are not sure right now of the first time that you became aware that [Appellant] was in T.D.C.?

A No, I'm not. But normally the first time we—and when I say "we," I'm talking about our office—finds out that somebody is down in T.D.C. is

when the name appears on the regularly scheduled arraignments for the 54th District Court. And as to the defendant's location or if he's out on bond, if it says T.D.C., that's the first time that we are normally aware that he is still not in the McLennan County Jail.

\* \* \* \* \* \*

Q What day is it that you claim that the State was and first became ready for trial in this cause?

A The 17th day of September 1985.

And the only reason it was that late, that's the date of the indictment, and there has got to be an indictment to go to trial.

(Emphasis added).

The prosecutor, having declared the State's readiness for trial from the date of the indictment (September 17, 1985), made a *prima facie* showing that the State was ready before the 120–day period expired on September 26. *See Jordan*, 639 S.W.2d at 478. This shifted the burden to Appellant to prove otherwise. *See Phillips*, 659 S.W.2d at 419. The question is whether Appellant ever rebutted the *prima facie* showing of readiness by proving that he was absent during the 120–day period.

■ The record contains an application for a bench warrant and a bench warrant, both dated October 7, 1985, which indicate that Appellant was in the Texas Department of Corrections when the warrant was issued. However, the record does not reflect how long Appellant had been in prison prior to October 7, and the prosecutor's testimony did not establish the date that he was placed in prison. The prosecutor's statement, that he might have learned Appellant was in prison "sometime prior to the 29th day of September 1985", did not establish that Appellant was in prison prior to September 26, the date when the 120–day time limit expired. He could have been placed in prison after September 26 (the 120th day) and before October 7 (the date of the bench warrant).

Accordingly, Appellant failed to rebut the *prima facie* showing of readiness by proving that he was absent during all or even a portion of the 120–day period between May 29 and September 26. Just because he was absent on October 7, 11 days after the 120–day period had expired, did not require the State to exclude the period of his absence under section 4. Point one is overruled because the court properly denied the motion to dismiss.

Appellant filed a pretrial motion to suppress Bowers' in-court identification of him as the robber. He alleged that the "one-man show-up", which occurred when police officers brought him to the store shortly after the robbery to see if Bowers could identify him, was so unnecessarily suggestive and condusive to an irreparable mistaken identity that it would taint her in-court identification. He argues that the one-on-one confrontation violated his right to due process under the federal and state constitutions. The second point is based on the denial of the motion to suppress.

■ An in-court identification is admissible if the record clearly reveals that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court identification. *Jackson v. State*, 657 S.W.2d 123, 130 (Tex.Cr. App.1983). This is true even though a pretrial identification procedure was impermissibly suggestive. *Id.* Factors which determine whether an in-court identification is of an independent origin include: (1) the witness' opportunity to observe the commission of the crime; (2) any discrepancy between the witness' pretrial description and the accused's actual description; (3) any identification by the witness of another person prior to trial; (4) the witness' identification of the accused prior to trial by picture; (5) the failure of the witness to identify the accused prior to trial; and (6) the amount of time elapsing between the crime and the pretrial identification. *Thompson v. State*, 480 S.W.2d 624, 627 (Tex.Cr.App.1972).

■ Bowers testified at the suppression hearing that she observed Appellant under well-lighted conditions during the robbery. She saw him face-to-face, from two or three feet away, when he first entered the store and when he stood across the counter from her as she gave him the money from

the cash register. She also observed him from thirty to forty feet away when he looked toward her after he had left the store. Appellant points out that she only had a few seconds to observe the robber and that she was scared and upset during the incident, factors which must have affected her ability to make an accurate identification. This type of complaint goes to the weight and not to the admissibility of her identification testimony. *See Jackson,* 657 S.W.2d at 128. Bowers had ample opportunity to observe the robber during the commission of the crime under conditions favorable to making an identification.

Furthermore, Appellant does not complain of any discrepancy between her description of the robber's height, weight and manner of dress and his actual description. However, he does note that she failed to described his facial hair, a prominent scar on his face, and the shirt and shoes he was wearing. Again, this complaint goes to the weight to be accorded her in-court identification rather than to its admissibility. *See id.*

Bowers also did not identify Appellant prior to trial by means of a picture or identify any other person as the robber. Finally, she did not fail to identify Appellant when police brought him to the store within twenty minutes after the robbery. Appellant notes that Bowers refused to positively identify him in the one-on-one confrontation, but merely told officers that she "thought" he was the robber. Bowers explained that she refused to make a positive identification in Appellant's presence because she was nervous, upset and scared. The degree of definiteness of a witness' identification affects its weight and not its admissibility. *Valenciano v. State,* 511 S.W.2d 297, 299 (Tex.Cr.App.1974).

Bowers insisted at the suppression hearing that she could identify Appellant based on her observations of him at the time of the robbery and that her in-court identification was not aided or affected by seeing him twenty minutes later in police custody. The record clearly reveals that her in-court identification was admissible because it

was of an independent origin. *See Jackson,* 657 S.W.2d at 130.

Although widely condemned as tending to be unnecessarily suggestive, a "one-man show-up" prior to trial does not invariably violate the accused's right to due process. *Cole v. State,* 474 S.W.2d 696, 698 (Tex.Cr.App.1971) (citing *Biggers v. Tennessee,* 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968)). However, due process is denied an accused if, judging from a totality of the circumstances, a pretrial identification procedure is so unnecessarily suggestive that there is a substantial likelihood it will result in an irreparable misidentification. *Id.* Each case must be considered on its own facts to determine the likelihood of irreparable misidentification. *Id.* The corrupting influence of a suggestive pretrial identification procedure, as it may affect the reliability of the in-court identification testimony, can be weighed by considering the following factors: (1) the opportunity of the witness to view the person; (2) the witness' degree of attention; (3) the accuracy of the witness' description; (4) the witness' level of certainty; and (5) the amount of time elapsing between the crime and the witness' confrontation with the accused. *Jackson,* 657 S.W.2d at 129–30. The excellent opportunity to view Appellant, the accuracy of the description which attests to the high degree of her attentiveness, the certainty of her identification, and the short period of time between the crime and the one-on-one confrontation with Appellant all establish the reliability of Bowers' identification testimony. *See id.* The pretrial confrontation between Appellant and Bowers did not result in a substantial likelihood of an irreparable misidentification. Assuming that the "one-man show-up" was unnecessarily suggestive, as Appellant claims, Bowers' in-court identification was nevertheless admissible because it was clearly of an independent origin. Point two is overruled.

Appellant argues in the fourth point that the court erred when it refused to suppress as evidence the pack of Salem cigarettes and the $48 in currency seized from him by police. He contends the cigarettes and cur-

rency should have been suppressed because they were the fruit of an unreasonable search and seizure.

■ Police discovered and seized the $48 hidden in Appellant's shoe and sock while he was being bcoked into jail. An "inventory search" of a person who is about to be jailed is a well-defined exception to the requirement of a search warrant. *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 2609, 77 L.Ed.2d 65 (1983). Therefore, the court properly refused to suppress the currency as evidence because it was lawfully seized in an "inventory search". *See id.*

■ However, whether the court should have excluded the package of Salem cigarettes as evidence involves a more detailed discussion. A police officer may stop an automobile and temporarily detain its occupants for the purpose of investigation. *Johnson v. State,* 658 S.W.2d 623, 626 (Tex. Cr.App.1983); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). An investigative stop is justified by circumstances that do not amount to probable cause for arresting the car's occupants. *Johnson,* 658 S.W.2d at 626. However, the officer must have a reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the person detained with the unusual activity, and some indication that the activity is related to a crime. *Id.* Furthermore, he must be able to articulate specific facts and inferences drawn from those facts which, in the light of his experience and personal knowledge, justify the reasonableness of his suspicion and warrant the intrusion upon the freedom of the person detained. *Id.* Detaining a person on an inarticulable hunch cannot be justified. *Id.* Facts or events which are as equally consistent with innocent activity as with criminal activity will not support an investigative stop and temporary detention. *Baldwin v. State,* 606 S.W.2d 872, 874 (Tex.Cr.App.1980). A court must examine the totality of the circumstances to determine whether the conduct of the police was reasonable. *Id.*

Appellant contends that the officer who stopped the automobile acted on a hunch and not on reasonable suspicion justified by articulable facts or inferences. He argues that the stop and detention violated his right to due process and that any evidence obtained as a result of the illegal stop and detention must be excluded.

Richard Davies, a Baylor University police officer, was on campus patrol when he received a radio message about the robbery and a description of the suspect. The description, which was broadcast to him by his patrol sergeant within minutes after the crime occurred, was of a "young black male, late teens early twenties, short hair, no facial hair, wearing blue sweat ... pants." Davies said that almost immediately after receiving the description he observed Appellant and another man sitting in a 1976 Ford Granada parked in front of an open 7–11 store. The store was located "seven blocks over, and two blocks down" from the Zippy store where the robbery occurred.

Davies said that Appellant, who was "slouched down" in the car's front passenger seat, matched the robber's description, although he admitted that he could not see how Appellant was dressed. Davies stated that both occupants of the car repeatedly looked at him and then looked away, that they seemed concerned about his presence and "were sort of keeping tabs on [him]." The officer watched as the driver of the Granada entered the 7–11 store and then returned to pump gas into the car. Davies followed the Granada in his patrol car as it left the 7–11 parking lot and drove along a nearby city street. After noticing that the "tail lens" on the left-hand side of the Granada was missing, he stopped the car just as several Waco patrol units arrived. Officers immediately ordered Appellant out of the car, and they observed that he was wearing blue sweat pants with a white string around the waist.

Officer Davies explained on cross-examination why he had stopped the car: "[The reason being] a young black male with short hair, plus the time being 2:00 in the morning, and the way they were acting, especially when they saw me in my patrol vehicle." The passenger, he said,

"slouched down in the car and kept looking over at me to see where I was [,] what I was doing [,] stuff like that." He said that the missing tail lens was *"part* of the cause for stopping him ... [b]ut that wasn't the purpose of my suspicion of the vehicle and actually wanting to stop him." (Emphasis added). Appellant did not deny that the car in which he was riding had a missing tail lens.

Appellant contends that the only specific facts that Davies could articulate in support of the reasonableness of his suspicion were that a nearby convenience store had just been robbed by a young black male with short hair and that he was a young black male with short hair who was parked in front of another convenience store. He argues that "slouching" in the passenger's seat, glancing at the patrol car, and sitting in a car in front of an open 7–11 store at 2:00 a.m. in the morning would not support a reasonable suspicion that he was connected with the Zippy robbery because these facts, although articulable, are as consistent with innocent activity as they are with criminal conduct. He emphasizes that Davies could not see that he was dressed in blue sweat pants until after he had stopped the car.

■ After excluding from consideration all those facts which Appellant insists are as consistent with innocent activity as with criminal conduct, the remaining facts which Davies articulated were sufficient to support an investigative stop of the car in which Appellant was riding. Davies had reasonable cause to be suspicious of any young black male with short hair that he observed in close proximity to the Zippy store, particularly at that time of the morning when most people are in bed. He had just received a report that a young black male with short hair had robbed a nearby Zippy store when he saw Appellant, a young black male with short hair, sitting in an automobile in front of another convenience store. These facts, regardless of whether they constituted probable cause for Appellant's immediate arrest, were sufficient to support an investigative stop of the car.

Appellant argues that the description of the robber would not support an investigative stop because, being so general, it would have justified Davies in stopping and detaining all young black males in the city. Officer Davies was not prevented from stopping an automobile containing a young black male with short hair, who was found in close proximity to the scene of the robbery, just because other young black males with short hair might live in the community. The confluence of the time of the robbery and the time when Davies observed Appellant in close proximity to the scene of the robbery supported a reasonable suspicion on Davies' part that he might be the robber. Every young black male with short hair would not be expected to be within close proximity of the robbery at that time of the morning. Accordingly, the totality of the circumstances support the investigative stop.

■ Officer Davies also had another independent reason to justify stopping the car. Traffic regulations require that an automobile operated on a public thoroughfare between sunset and sunrise must be equipped with lighted stoplights, turn signals and other illuminating devices. *See* Tex.Rev.Civ.Stat.Ann. art. 6701d, § 109(a) (Vernon 1977). Driving a vehicle on a public thoroughfare when it is not so equipped is a misdemeanor. *See id.* at § 108(a–1)(2) (Vernon Supp.1987). Therefore, driving the Ford Granada on a public street at 2:00 a.m. in the morning with a missing tail lens constituted a traffic offense that was committed in Davies' presence. An officer may stop an automobile for a traffic offense. *Howard v. State,* 599 S.W.2d 597, 599 (Tex.Cr.App.1980). Accordingly, Davies had a lawful reason, independent of any suspicious activity on the part of Appellant, to stop the automobile because of the missing tail lens.

■ Once an officer has lawfully made an investigative stop, he may make a carefully limited search for weapons of the detained person's outer clothing, if he has a reasonable belief that the person might then be armed and dangerous. *See Manry v. State,* 621 S.W.2d 619, 622 (Tex.Cr.App.

1981). He may conduct a "pat-down" search of the outer clothing for weapons even though the circumstances might not yet amount to probable cause for the suspect's arrest. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). However, the scope of the search must be confined to an intrusion reasonably designed to discover guns, knives or other hidden weapons which might be used to assault the officer. *Id.* at 1884. An officer may reasonably believe that a person who fits the description of a robbery suspect could be armed and dangerous when he is being temporarily detained for investigation within minutes of the robbery. *Id.* at 1883.

 When Appellant, who otherwise matched the robber's physical description, emerged from the car in blue sweat pants, Davies could have reasonably believed that he was then armed and dangerous because he matched all of the essential elements of the robber's description: he was a young black male with short hair who was wearing blue sweat pants with a white string around the waist. The unopened pack of Salem cigarettes was discovered by officers during a "pat-down" search of Appellant's outer clothing. Davies said that he felt a square object in Appellant's right sock, that he could not tell whether it was a weapon, and that he discovered it was only a pack of cigarettes after it had been removed from the sock.[1] The package of Salems was properly admitted into evidence because it had been seized during a carefully limited and lawfully conducted "pat-down" search of a suspect that officers had a right to reasonably believe might then have been armed and dangerous. Point four is overruled.

The court instructed the jury on the parole law during the punishment phase as required by article 37.07 of the Code of Criminal Procedure. *See* Tex.Code Crim.Proc.Ann. art. 37.07, § 4 (Vernon Supp.1987). Appellant claims that the instruction was imposed by the legislative branch on the judicial branch in violation of the "separation of powers" clause of the Texas Constitution. He also argues that the instruction, given to the jury without any objection on his part, violated his right to due process and constituted fundamental error. This court has already rejected the argument that the parole instruction violates the separation of powers doctrine. *See Foy v. State*, 726 S.W.2d 263, 266 (Tex. App.—Waco 1987, no pet.). Furthermore, giving such an instruction could not constitute error or fundamental error. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Cr.App.1985) (on rehearing).

Affirmed.

---

1. Officer Nix testified that the package of Salems was not removed from Appellant's sock, but fell out of his sock onto the ground while he, Nix, was conducting the "pat-down" search.